# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## AIP ACQUISITION LLC,
*Appellant,*

v.

## CISCO SYSTEMS, INC.,
*Appellee.*

---

Appeal No. 16-2371

---

Appeal from the Patent and Trademark Office
Patent Trial and Appeal Board in *Inter Partes* Review No. IPR2015-00307

---

## REPLY BRIEF OF APPELLANT
## AIP ACQUISITION LLC

---

ENG LAW FIRM
Chi Eng
One Gateway Center, Suite 2600
Newark, New Jersey 07102
P. 646-770-2347

COHEN & GRESSER LLP
Karen H. Bromberg
Francisco A. Villegas
Damir Cefo
Elizabeth F. Bernhardt
800 Third Avenue
New York, New York 10022
P. 212-957-7600

Erica C. Lai
2001 Pennsylvania Avenue NW,
Suite 300
Washington, DC 20006
P. 202-851-2070

*Counsel for Appellant*
*AIP Acquisition LLC*

Dated:  March 30, 2017

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant AIP Acquisition LLC certifies the following:

1.    The full name of every party represented by me is:  AIP Acquisition LLC.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  None.

3.    All parent corporations and any publicly-held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the district court or agency or are expected to appear in this Court are:

**Lucas & Mercanti LLP**:  Alfred Froebrich

**Eng Law Firm:**  Chi Eng

**Cohen & Gresser LLP:**  Karen H. Bromberg, Francisco A. Villegas, Damir Cefo, Elizabeth F. Bernhardt, and Erica C. Lai

**Nelson Bumgardner PC:**  Timothy E. Grochocinski, Joseph P. Oldaker, and Matthew Juren.

DATED:     March 30, 2017

/s/ Karen H. Bromberg
COHEN & GRESSER LLP
Karen H. Bromberg
Francisco A. Villegas
Damir Cefo
Elizabeth F. Bernhardt
800 Third Avenue
New York, New York 10022
P. 212-957-7600

COHEN & GRESSER LLP
Erica C. Lai
2001 Pennsylvania Avenue NW,
Suite 300
Washington, DC 20006
P. 202-851-2070

ENG LAW FIRM
Chi Eng
One Gateway Center, Suite 2600
Newark, New Jersey 07102
P. 646-770-2347

*Counsel for Appellant*
*AIP Acquisition LLC*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT ................................................................................ 2

I.  Claim construction:  Contrary to Cisco's contention, "internet protocol"
    and "Internet protocol" have a singular meaning—the IP of TCP/IP ............ 2

    A.  Contrary to Cisco's argument, the Patent's claims and
        specification prove that "I/internet protocol" can mean *only* the
        IP of TCP/IP ................................................................ 3

    B.  Contrary to Cisco's argument, the prosecution history is
        consistent with the Patent claims and specifications, and with the
        conclusion that "I/internet protocol" means the IP of TCP/IP ............. 8

    C.  Contrary to Cisco's claim, the extrinsic evidence supports AIP's
        proposed claim construction ............................................... 12

        1.  A POSITA would consult Internet Standards documents,
            not style manuals ..................................................... 15

        2.  Cisco's argument based on related patent materials
            supports AIP's proposed claim construction ........................... 17

    D.  Cisco has failed to address some of AIP's claim construction
        arguments .................................................................. 19

II.  Contrary to Cisco's contention, the Patent is not obvious in light of
     prior art combinations ........................................................ 20

     A.  Contrary to Cisco's claim, prior art failed to disclose conversion
         of the transmission to the IP of TCP/IP .................................. 21

         1.  Weinstein-RFC1190 did not disclose—and actually taught
             away from—conversion of the transmission to the IP of
             TCP/IP ................................................................ 21

         2.  Encapsulation of ST/ST-II packets does not equate to the
             claimed conversion .................................................... 23

B.    Intervenor failed to explain why the PTAB's obviousness conclusion relied on an argument not articulated by Cisco ................26

C.    Contrary to Cisco's contention, the PTAB did not properly weigh all of the factors relevant to the obviousness determination ...............27

    1.    Cisco glosses over the incompatibility of ST-II and ST ..........27

    2.    Internet engineers near the time of the Invention (1995) were not implementing ST-II for voice communication over the Internet .......................................................................29

CONCLUSION ........................................................................................33

ii

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008) ........................................................25

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003) ..........................................................7

*August Tech. Corp. v. Camtek, Ltd.*,
    655 F.3d 1278 (Fed. Cir. 2011) ........................................................26

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent
    Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012) ........................................................33

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*,
    887 F.2d 1050 (Fed. Cir. 1989) ........................................................11

*Invitrogen Corp. v. Clontech Labs., Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005) ..........................................................7

*Lydall Thermal/Acoustical, Inc. v. Fed.-Mogul Corp.*,
    344 F. App'x 607 (Fed. Cir. 2009) ....................................................12

*Microsoft Corp. v. Proxyconn, Inc.*,
    789 F.3d 1292 (Fed. Cir. 2015) ........................................................11

*Middleton, Inc. v. Minn. Mining & Mfg. Co.*,
    311 F.3d 1384 (Fed. Cir. 2002) ........................................................17

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ..........................................................8

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999) ........................................................16

*Voice Techs. Grp., Inc. v. VMC Sys., Inc.*,
    164 F.3d 605 (Fed. Cir. 1999) ..........................................................16

# INTRODUCTION AND SUMMARY OF ARGUMENT

U.S. Patent No. 7,269,247 (the "Patent") was a foundational patent in digital telephony. Cisco suggests that Internet-based telephony was commonplace by the 1980's, but that is not true. Over twenty-five years ago, when the Patent was being developed in the early 1990's, the Internet was still in its infancy. The transmission of telephone calls was primarily accomplished using analog signals over copper lines. Cisco's proffered prior art—of ST and ST-II—was ineffective and inefficient, and lacked scalability. The Patent filled this void. It enabled efficient digital communications by uniting two disparate sets of telephonic technology: call processing (physically moving the call around, such as through switching) and content processing (such as digitizing, storing, recognizing, compressing, and multiplexing).

This appeal involves two disputes. The first dispute concerns the meaning of "internet protocol" and "Internet protocol," and Cisco's erroneous claim construction (which relies on differences in capitalization and other minor typographical issues to ascribe different meanings to the terms). AIP's proposed claim construction—that there is a singular "I/internet protocol"—is supported by the claims and specification. Moreover, AIP's construction—unlike Cisco's—is consistent with how a person of ordinary skill in the art ("POSITA") would

understand the terms in view of Internet Standards documents that controlled and continue to control the Internet we all know.

The second dispute is whether the Patent was novel, or whether, as Cisco contends, earlier failed experiments made the Patent obvious. Tellingly, not one of the experiments predating October 1995—when the Patent application was first filed—showed that intelligible voice calls could be translated into and transmitted over the standard Internet protocol.

In short, the record cannot support Cisco's arguments. Accordingly, the decision below should not stand.

## **ARGUMENT**

### I. **Claim construction: Contrary to Cisco's contention, "internet protocol" and "Internet protocol" have a singular meaning—the IP of TCP/IP**

Cisco's proffered claim construction is based on two faulty propositions. *First*, that differences in capitalization between "internet protocol" and "Internet protocol" impart distinct meanings. *Second*, that regardless of capitalization, I/internet protocol is a generic term for network transmissions. The record evidence contradicts these propositions.

Although I/internet protocol was not explicitly defined in the specification, the consistent and overall manner in which I/internet protocol was used in the conversion and transmission steps of Claims 1 and 16 can be reconciled *only* with AIP's proposed construction. The extrinsic evidence, including all sources cited in

2

the PTAB's Final Written Decision ("Decision") and related U.S. Patent No. 7,724,879 ("the '879 Patent"), are all in agreement.

>    **A.    Contrary to Cisco's argument, the Patent's claims and specification prove that "I/internet protocol" can mean *only* the IP of TCP/IP**

The Patent's claims and specification (including the Patent's figures) demonstrate that I/internet protocol is the IP of TCP/IP.  The specification teaches that "[t]he Internet . . . us[es] transmission control protocol/Internet pro[tocol]," thereby defining the Internet in terms of the TCP/IP protocol suite.  Appx50, 7:34-39.  This unifying technical disclosure ties together the Internet and the protocol suite.  That integration between the Internet and the protocol is further confirmed by reference to the conversion and transmission steps of Claims 1 and 16.

**Conversion**:  The conversion step of Claims 1 and 16 is shown below:

| Claim 1 | Claim 16 |
|---|---|
| performing a first conversion converting the transmission from the first format to a second format, the second format being internet protocol<br><br>Appx54, 15:48-50. | converting the transmission received from the calling party from the first format to a second format . . . and wherein said second format is Internet protocol<br><br>*Id.*, 16:44-45. |

3

Figure 8 illustrates this step:



FIG. 8

Appx45.  Figure 8 is a schematic representation of a central local node interacting with access devices and networks labeled "Internet TCP/IP," "Frame Relay and ATM," and "Digital and Analog Voice Lines."  *See* AIP's Opening Brief ("AOB") 15-16, 19, 30.  The main processor and router route the communications through appropriate converters (shown in Blue) to suit the network (shown in Red) being utilized for routing (*i.e.*, Internet TCP/IP, Frame Relay and ATM, or Digital and Analog Voice Lines).  AOB19.

4

The claim language, with the specification text and Figure 8, demonstrates that the patented technology teaches the IP of TCP/IP as the **single** network protocol for use on the Internet. Tellingly, Cisco neither rebuts nor even addresses this evidence, which AIP long ago brought to Cisco's and the PTAB's attention. Appx325-326. This evidence is also not discussed in the Decision.

**Transmission**: The transmission step of Claims 1 and 16 is shown below:

| Claim 1 | Claim 16 |
| --- | --- |
| sending the converted transmission through a second communication network, the second communication network being the Internet, for reception by a second access device<br><br>Appx54, 15:51-54. | transmitting the converted transmission through the Internet to a further node capable of connecting to the called party on a further network<br><br>*Id.*, 16:45-46. |

This step is illustrated by Figure 2:



Appx48, 3:50-51. Depicted in this "system overview" of the technology, Figure 2 describes the system architecture as "networked using transmission control protocol/Internet pro[tocol] TCP/IP." AOB14-15. The referenced network is

5

identified as the "Internet Backbone." AOB15. Again, the claim language, taken together with the specification text and Figure 2, demonstrates that the Patent describes a *single* network protocol for use on the Internet. No other protocols are disclosed, nor does Cisco point to anything in the specification that suggests the possibility of another protocol.

Cisco entirely fails to address this intrinsic evidence. Instead, Cisco focuses on a typo in the term "protocol" (accidently spelled "program"). *See* Cisco's Response Brief ("CRB") 9, 30. Cisco acknowledges that it was a typo, including the *sic erat scriptum* notation. *See* CRB30 ("transmission control protocol/Internet program [sic]"). Nevertheless, Cisco argues that because the misspelled "I/internet protocol" did not technically appear in the specification, this term is "best read as [a] generic term[]." CRB9, 30-31. The PTAB correctly rejected this extreme position. Appx525:11-17.

Instead of rebutting the intrinsic evidence that supports AIP's proposed claim construction, Cisco misrepresents the record, claiming that "AIP conceded in the proceeding below . . . that the patent does not specifically indicate an intention for these terms to refer to a single, specific protocol." CRB26 (citing Appx11; Appx529:14-17). But the record shows something else entirely. Not seeing "I/internet protocol" defined in the Patent, Judge Lee asked, "[I]s there anything explicit in the file history where the [p]atent applicant said to the office, . . .

6

[w]henever I say internet protocol, I mean an industry authority-accepted standards[?]" Appx528:19-23. AIP's counsel replied, "No." Appx529:17. This colloquy does not show a concession, but an agreement by AIP to the obvious fact that "I/internet protocol" was not explicitly defined in the Patent, and therefore required construction.

It is axiomatic that when a claim term is not explicitly defined in a patent, it may be construed by the Court. *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1076 (Fed. Cir. 2005) ("Although the [patent] specification does not expressly define [the] term, it unmistakably teaches how one skilled in the art would [understand it]."); *cf. ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered . . . ."). Here, the meaning of "I/internet protocol" did not turn on a direct definition, but arose from the context provided by the related language and technical disclosures concerning conversion and transmission.

Cisco argues that using the specification to help construe a claim term is impermissible. CRB31. But here, using the specification to clarify the terms "Internet protocol" and "internet protocol" does not improperly import a limitation into Claims 1 and 16. Rather, the specification is helpful knowledge that demonstrates how a POSITA would understand and apply the IP of TCP/IP. That

is helpful knowledge and demonstrates how a POSITA would understand the terms. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (specification showed that "nothing in the context . . . indicate[d] that the patentee contemplated any alternative" embodiment to the one presented) (internal quotation marks omitted). Contrary to Cisco's assertions, the intrinsic materials fully support AIP's proposed claim construction.

### B.    Contrary to Cisco's argument, the prosecution history is consistent with the Patent claims and specifications, and with the conclusion that "I/internet protocol" means the IP of TCP/IP

Cisco's sole intrinsic evidence consists of inferences from purely linguistic factors: (1) the patentee's occasional use of the indefinite article "an" preceding some I/internet protocol terms; (2) inconsistent capitalization of I/internet protocol; and (3) use of the words "including" and "comprising." CRB31-34.

However, contrary to Cisco's contentions, these isolated linguistic—or more properly, typographical—slips, in remarks to the PTO, do not undermine what the Patent specification teaches and a POSITA would have understood: that I/internet protocol meant the IP of TCP/IP. Indeed, neither the patentee nor the PTO attributed any significance to these slips. Specifically, the indefinite article "an" appeared at the filing of Claim 38 and during the first amendment to Claim 58. The "an" of both claims was subsequently removed. Tellingly, the claims were

8

allowed by the PTO without any indefinite article. The pertinent prosecution history is summarized below:[1]

|  | Statement |
|---|---|
| **5/14/05 Original Language** | |
| Claim 38 | "an internet protocol"  Appx1224. |
| Claim 58 | n/a  Appx1226-1227. |
|  | |
| **10/13/06 Response to PTO** | |
| Claim 38 | **Amendment**<br>"~~an~~ internet protocol"  Appx1126.<br><br>**Argument**<br>"a second format comprising Internet protocol" Appx1132.<br><br>"transmissions to a global network of high capacity data networks including the Internet TCP/IP." *Id.*<br><br>"there is no teaching or suggestion [in Zabarsky] that the second format is the Internet protocol." Appx1184. |
| Claim 58 | **Amendment**<br>"an Internet protocol"  Appx1128. |
|  | |
| **3/14/07 Response to PTO** | |
| Claim 38 | **Argument**<br>"Claim[] 38 . . . requires . . . that the transmission is converted to Internet protocol and sent using Internet protocol."  Appx1084. |
| Claim 58 | **Amendment**<br>"~~an~~ is Internet protocol" Appx1080. |

---

[1] In the following charts, new text is underlined and removed text is red and struck through.

9

| | Argument<br>"Claim[] 58 . . . each . . . requires . . . that the transmission is converted to Internet protocol and sent using Internet protocol."  Appx1084. |
|---|---|
| | |
| **6/13/07 Notice of Allowance** | |
| Claims 38 & 58 | **PTO**<br>"The following is an examiner's statement of reasons for allowance.  Regarding **claim(s) 38 and 58** . . . the prior art of record fails to disclose . . . the second format being internet protocol."  Appx1069. |

It is clear in context that use of "an" was at times a slip that the patentee tried to correct.  For both the patentee and the PTO, it was clear that a specific, proper noun was intended:  I/internet protocol.  It is also clear that the patentee and PTO used "internet protocol" and "Internet protocol" interchangeably throughout.  The patentee and PTO attributed no significance to capitalization, and it should not be a significant factor in this Court's decision.

As for "comprising," the patentee *once* inadvertently used this word (in the prosecution's first response to the PTO), but ***never did so again***.  Yet Cisco focuses on its single use. CRB32-33.  Although it would not be far-fetched to ascribe significance to the word—if it had been used intentionally or repeatedly, or even if it had been used more than once—no such meaning should be given to a one-time typographical error.  Moreover, nothing in the Notice of Allowance suggested that the PTO relied on this error in issuing the claims.  Thus, under a fair reading of the prosecution history, this Court should disregard the one-time use of

the word.  *See Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989) (issued claim language controlled over an erroneous attorney remark made during the patent prosecution).

Similarly, Cisco misattributes significance to the word "including." CRB32-33, though "including" did not operate as an open-ended transition in the prosecution history, *see* AOB17-23, 30-32, but merely described one of the formats that the converters (A-F) in Figure 8 can accommodate:  In the case of the transmission step of Claims 1 and 16, it was the Internet and its associated IP of TCP/IP.

Finally, Cisco alternatively speculates that the patentee either surrendered its disclaimer argument or did not explicitly disclaim other protocols, and therefore did not limit I/internet protocol to the IP of TCP/IP.  CRB31-34.  But there is no internal logic or record support for this speculation.  Nothing in the prosecution history shows that the patentee sought to claim any protocol besides the IP of TCP/IP.  No internet protocol but the IP of TCP/IP was identified.

Rather, despite Cisco's contentions, the prosecution history is consistent with the Patent's claims and specification.  The occasional typo or trivial language error did not bear on how the claims should be construed, nor detract from the evidence-based conclusion that "I/internet protocol" meant the IP of TCP/IP.  *Cf. Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) ("A

construction that is unreasonably broad and which does not reasonably reflect the plain language and disclosure will not pass muster.") (internal quotation marks omitted); *Lydall Thermal/Acoustical, Inc. v. Fed.-Mogul Corp.*, 344 F. App'x 607, 614 (Fed. Cir. 2009) (holding that to the extent "the prosecution history appears in conflict with the specification, any ambiguity must be resolved in favor of the specification").

### C. Contrary to Cisco's claim, the extrinsic evidence supports AIP's proposed claim construction

Cisco claims that two extrinsic references cited in the Decision support its claim construction, CRB35:  (1) Tanenbaum, Appx14-15 (citing Appx3437-3439); and (2) Weinstein, Appx14-15 (citing Appx1608).  Neither reference, however, supports the conclusion that "Internet protocol" and "internet protocol," as used in the Patent, were distinct terms.

**Tanenbaum**:  As discussed, the transmission steps of Claims 1 and 16 require the communication network to be the "Internet."  And, Tanenbaum shows that a POSITA would understand that ***only*** IP of TCP/IP is used on the Internet.

Tanenbaum distinguished between a generic "internet" (lowercase i) and "Internet" (capital I).  In describing generic internetworking, Tanenbaum always used the term "internet":

- "Two styles of *internetworking* are common: a connection-oriented concatenation of virtual subnets, and a datagram *internet* style. . . .

12

Fig.5-36.    *Internetworking* using concatenated virtual circuits."
Appx3437 (emphasis added).

- "The alternative *internetwork* model . . . . Fig.5-37.  A connectionless *internet*."  Appx3438 (emphasis added).

None of these references were protocol-specific, which was consistent with the PTAB's observation that "internetworking was accomplished through the use of multiprotocol routers (or gateways) between disparate virtual circuit networks." Appx15.

By contrast, when describing a specific kind of internetworking, Tanenbaum used the capitalized "Internet":

- "A second, and more serious problem, is addressing.  Imagine a simple case:  a host on the Internet is trying to send an IP packet to a host on an adjoining OSI network."  Appx3439.

A POSITA reading Tanenbaum would recognize that the "serious problem" was the incompatibility of the Internet protocol (IP) with the more generic OSI "internet" and one of its protocols, which is CLNP.  Therefore, Tanenbaum—an example of the state of the art in 1996, Appx3430-31—confirms that Internet transmissions were in IP.

The PTAB cited language in Tanenbaum as evidence that the internet supports multiple protocols:

13

> Another idea is to design a universal "internet" packet and have all routers recognize it. This approach is, in fact, what IP is—a packet designed to be carried through many networks. The only problem is that IPX, CLNP, and other "universal" packets exist too, making all of them less than universal. Getting everybody to agree to a signal format is just not possible.

Appx14; Appx3439. But in the Patent, and consistent with Tanenbaum, the transmissions of Claims 1 and 16 occur over the Internet, not the generic "internet." Although the generic "internet" in Tanenbaum may use any number of protocols, the Patent is specific, disclosing that "[t]he Internet . . . us[es] transmission control protocol/Internet pro[tocol]." Appx50, 7:34-36, and claiming transmissions specifically on the Internet.

**Weinstein**: The Weinstein reference is straightforward and similarly supports AIP's claim construction:

> ST operates at the same level in the protocol hierarchy as IP, the DoD standard internet protocol [11] for datagram traffic.

Appx1611. Weinstein clarified that IP was the protocol from the Department of Defense, the *same one* described in the Patent. Appx50 7:36-38 ("transmission control protocol/Internet pro[tocol], which is a set of protocols developed by the Department of Defense"). Thus, Cisco's proffered evidence supports the conclusion that "I/internet protocol" is the IP of TCP/IP.

14

1.    **A POSITA would consult Internet Standards documents, not style manuals**

Contemporary Internet Standards documents conclusively rebut Cisco's position and support AIP's claim construction.  In 1995, the priority date of the invention, the IP Standard was IPv4, as defined in Request for Comments ("RFC") 791.  AOB7.  During that same time period, the TCP Standard was set by RFC793.  *Id*.  Cisco's technical expert conceded the authority of these two references.  Appx3340-3341¶24 ("In 1994 . . . , the IP standard was IP version 4, defined in [RFC]791[and] often used in conjunction with a higher-layer protocol known as . . . TCP. . . . often referred to together as TCP/IP.").

These seminal documents reflect ***no*** distinction effected by capitalization of the "I" in "Internet" or the "P" in "Protocol."  Rather, every permutation of capitalization is used interchangeably.  *See*, *e.g.*, Appx1828 (using both "Internet Protocol" ***and*** "internet protocol"); Appx1832 ("Internet protocol").  The TCP Standard also disregarded capitalization.  AOB8 (quoting Appx1881).

Such industry references support AIP's claim construction and are at odds with Cisco's focus on capitalization, CRB29-30.  Moreover, such references are uniquely authoritative because "[a] technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention."  *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1309 (Fed. Cir. 2012) (internal quotation marks omitted).

15

"Patents are written not for laymen, but for and by persons experienced in the field of the invention." *Voice Techs. Grp., Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999); *see also Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999) ("[I]t is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction . . . is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field.").

Contrary to Cisco's assertion, the Internet Standards documents were not "remote in time." CRB36. While RFC791 and RFC793 were published in 1981, Appx1822, 1874, they remained the IP/TCP standard in 1995, at the time of the Patent's application. AOB7 (citing Appx3340-3341¶24). As Cisco conceded, even today, IPv4 remains an Internet standard. Appx516:9-10 ("I believe that IPv4 is still considered a capital I, capital S Internet Standard today.").

Cisco asserts—citing the 16th edition of *The Chicago Manual of Style*—that the "use of lowercase letters would have suggested to a POSITA that" I/internet protocol is generic, and that if the patentee had intended to claim IP, "it could have done so by capitalizing both 'Internet' and 'Protocol.'" CRB29. But no POSITA would consult a style manual to understand a technical term. Rather, a POSITA would consult a document like the standards documents creating TCP/IP. "The meaning of patent terms depends on the usage of those terms in context by one of

16

skill in the art at the time of the application." *Middleton, Inc. v. Minn. Mining & Mfg. Co.*, 311 F.3d 1384, 1389 (Fed. Cir. 2002).

Tellingly, the 16th edition of *The Chicago Manual* was published in 2010, Appx2505-2506—***fifteen years after*** the Patent's application. A more relevant authority would be the 13th edition of the Manual from 1982, Appx3844-3846. This edition espoused a flexible approach to proper noun capitalization, noting that "[m]odern publishers . . . usually discourage excessive use of capital letters," and advising, "[e]xperienced editors realize that no set of rules in the area of capitalization can be universally applicable," and "[q]uestions and differences of opinion arise over just what is a proper noun." Appx3853-54 (emphasis omitted).

### 2. Cisco's argument based on related patent materials supports AIP's proposed claim construction

For the first time, Cisco asserts that the related '879 Patent and U.S. Patent Application No. 09/551,189 ("the '189 Patent Application"), both of which use the term I/internet protocol, are relevant extrinsic sources.  However, to the extent these sources are even relevant, they support AIP's claim construction, not Cisco's.

As compared to the '247 Patent, the '879 Patent has a broader specification expanding the scope of protocols in its claimed communications processes:

| '247 Patent Specification | '879 Patent Specification |
|---|---|
| The Internet network differs from frame relay switching and asynchronous transfer mode by using transmission control protocol/Internet program, which is a set of protocols developed by the Department of Defense to link dissimilar computers across a variety of other networks and protocols.<br><br>Appx50, 7:34-39. | The Internet network differs from frame relay switching and asynchronous transfer mode by using internet protocols such as transmission control protocol/Internet ~~program~~ protocol (TCP/IP), which is a set of protocols developed by the Department of Defense to link dissimilar computers across a variety of other networks and protocols.<br><br>Appx2173-2174. |

As shown here, the '879 Patent expanded the specification to include multiple protocols by adding "internet protocol*s such as*."  This expanded protocol disclosure enabled the patentee to obtain broader claim language in the conversion step.  This can also be seen below:

| '247 Patent, Claim 1 (excerpt) | '879 Patent, Claim 1 (excerpt) |
|---|---|
| performing a first conversion converting the transmission from the first format to a second format, the second format being internet protocol<br><br>Appx54, 15:48-50. | performing a first conversion converting the transmission from the first format to a second format, the second format being an internet protocol<br><br>Appx2195. |

The '879 Patent confirms that when the patentee sought protocols beyond the IP of TCP/IP, it did so with explicit language in the specification and claims.

Cisco asserts that the parent of the '879 Patent, the '189 Patent Application, shows that the patentee could have explicitly claimed the "Internet Protocol of TCP/IP."  CRB32 (citing Appx933, '189 Patent Application proposed claim 61:

18

"wherein the selected data network uses Transmission Control Protocol/Internet Protocol."). But in this Application, the patentee was claiming the use of both IP *and* the transport protocol, TCP. In seeking this narrower claim, it would be necessary to specifically reference the entire TCP/IP protocol suite.

Therefore, the '879 Patent and '189 Patent Application do not show that the meanings of terms in related patent documents must be ascribed to the '247 Patent.

### D. Cisco has failed to address some of AIP's claim construction arguments

AIP showed in its principal brief that the PTAB's faulty claim construction rendered a term superfluous. The PTAB drew an artificial distinction between "internet protocol" and "Internet protocol," construing the former to mean "a specific set of rules, procedures, or conventions relating to the format and timing of data transmissions between two devices on different networks," and the latter to mean transmissions between two devices "over the Internet." Appx15. If Claim 1 requires transmission through the Internet, the PTAB's construction of "internet protocol" is rendered superfluous because no such generic transmission will ever occur. Though superfluous construction is a sign of error, Cisco fails to address this issue, merely stating that despite the superfluous construction, nothing is wrong. CRB37.

Additionally, AIP's principal brief demonstrated that the PTAB's claim construction was overbroad, encompassing already excluded or traversed prior art

19

such as ATM and Frame Relay, Tone Signal, and RS232. AOB39-40. Cisco's sole response was that AIP waived its rights, CRB37-38. However, no such waiver occurred. The exclusion of ATM and Frame Relay Switching from Internet protocol was discussed in the Patent Owner's Preliminary Response, Appx241, and adopted by the PTAB's Decision to Institute Trial. Appx275 ("Thus, the protocols used *within* ATM and frame relay switching networks are not internet protocols."). As for tone signal and RS232, after the PTO rejected the Patent application based on Zabarsky, Appx1135, the patentee explained that "neither the tone signal format nor the RS-232 format discloses the use of Internet protocol format, as recited in independent claims 38 and 58." Appx1136. The objection was traversed. Appx1069.

## II. Contrary to Cisco's contention, the Patent is not obvious in light of prior art combinations

Among other things, the Patent teaches the ***conversion*** of voice network format ***to the IP of TCP/IP*** (also known at the time as "IPv4") to transmit intelligible, high-quality voice communications for telephone calls over the Internet. Despite the PTAB's and Cisco's position to the contrary, Weinstein and RFC1190 failed to disclose the claimed conversion or even accomplish the intended purpose because (a) the ST-II packets encapsulated in IP disclosed by RFC1190 are not the claimed IPv4 packets, and (b) ST-II protocol is incompatible with the ST protocol Weinstein taught. As for prior attempts to transmit voice

20

communications over the Internet using ST-II, *not one implementation* converted voice data to IPv4.  Accordingly, the Patent was not "obvious."

### A. Contrary to Cisco's claim, prior art failed to disclose conversion of the transmission to the IP of TCP/IP

Cisco contends that the Weinstein-RFC1190 combination, on which the PTAB relied, disclosed the Patent's claimed conversion of the voice transmission to IPv4.  CRB39-42.  But this prior art combination at best disclosed conversion to ST/ST-II *packets* and encapsulation of these packets to IP packets—which is *not* the claimed conversion to IPv4.

#### 1. Weinstein-RFC1190 did not disclose—and actually taught away from—conversion of the transmission to the IP of TCP/IP

Cisco claims that the prior art's disclosure of a simple conversion to ST or ST-II satisfied the claimed conversion.  CRB39-41.  In arguing that Weinstein alone taught converting voice transmissions into IP, Cisco points to Weinstein Figure 9 and excerpts disclosing conversion of voice data into the "'ST' Streaming Protocol."  *Id.*  However, conversion of voice data from the original network to a second data network does not suffice—*conversion to IPv4* is what the Patent claims.  Unlike IPv4, which was, and is still considered, an *Internet Standard* by the telecommunication industry, Appx516, the *experimental* ST protocol was never adopted as a Standard and was not understood by a POSITA in the mid-1990s as an Internet Protocol.  Appx3493¶23; Appx3513¶85.

21

Cisco also argues that Weinstein's disclosures, combined with RFC1190's teaching of the newer ST-II protocol, made obvious the conversion limitation in the Patent.  CRB41-42.  In particular, Cisco focuses on the ST-II nomenclature: (a) ST-II's formal name is "Internet Stream Protocol," (b) ST-II is known as version 5 of the Internet Protocol, and (c) ST-II "runs at the same level of the networking stack as other versions of the Internet Protocol."  CRB42.

However, regardless of similar-sounding nomenclature, ST-II is not the IPv4 disclosed in Claims 1 and 16.  Moreover, ST-II, like ST, was and remains *experimental*.  Both Dr. Pink and Dr. Weinstein, AIP's experts, explained that within the Internet community, ST-II "is ***not*** referred to as internet protocol in IETF documents" and "has ***not*** been accepted as a [S]tandard by the telecommunication industry," as IPv4 has been.  Appx2552:14-15; Appx3508¶66; *see also* Appx3508¶68; Appx3775¶¶36-38; Appx3778¶50; Appx3780¶¶55-56 (emphases added).

More importantly, Weinstein and RFC1190 combined actually taught away from conversion of voice transmission to IPv4.  RFC1190 explicitly stated, "[t]he motivation for the original [ST] protocol was that [the] IP [of TCP/IP] did not provide the delay and data rate characteristics necessary to support voice application."  Appx1632.  "ST [was] developed to support [more] efficient delivery of streams of packets" than IP.  *Id.*  Weinstein and RFC1190 viewed IP (of

22

TCP/IP) as less suitable for transmitting voice than ST or ST-II. As Dr. Weinstein explained, "the architects of the Weinstein[] system ***chose not to employ TCP/IP for transporting voice packets.***" Appx3505¶60 (emphasis added).

Thus, there is no merit to Cisco's argument that the Weinstein-RFC1190 combination met the claimed conversion of the transmission element simply by disclosing conversion of voice transmissions to ST or ST-II. These references actually discouraged using IPv4 for voice transmissions.

### 2.    Encapsulation of ST/ST-II packets does not equate to the claimed conversion

Contrary to Cisco's claim, the crucial element of conversion was not disclosed or suggested by Weinstein and RFC1190. RFC1190 disclosed encapsulating ST-II packets ***inside*** IP packets, not translating the original voice transmission ***into*** IPv4. Encapsulation does not achieve conversion: The ST-II packets encapsulated in IP packets retained ST-II-headers and remained ST-II packets. *See* AOB41-44. Encapsulation "'provide[s] connectivity . . . across portions of an internet that do not provide support for ST[-II],'" CRB44 (quoting Appx1634), but it does not convert or translate the original transmission directly to IPv4, as the Patent instructs.

Rather than addressing this crucial distinction, Cisco accuses AIP of ignoring the first step in the Weinstein-RFC1190 combination, which generated ST-II packets. CRB44-45. But adding the first step of ST or ST-II

23

packetization—which is ***not*** conversion to IPv4—to subsequent encapsulation would still fail to convert the original voice transmission into IPv4.

Claims 1 and 16 teach conversion of a "transmission" from the first network (*i.e.*, the original voice network) to "internet protocol" or "Internet protocol." Appx54, 15:47-49, 16:43-52. As discussed, both claims refer to IPv4. Thus, the Patent discloses converting original voice data into the IPv4 packets. The IPv4 packets consist of (a) "data," where only pure encoded voice data is located, and (b) an IPv4 "header" containing, *inter alia*, information about the voice data itself and the corresponding IPv4 transport. *See* Appx1829, Appx1832 (an IPv4 packet prepared by an internet module includes both an internet header and data).

By contrast, Weinstein and RFC1190 taught the conversion of voice data to ST or ST-II packets, each ST or ST-II packet containing encoded voice data and an ST or ST-II header. Conversion of ST or ST-II packets to IPv4 would require stripping ST/ST-II headers and ***replacing*** them with IPv4 headers. *See* Appx3777¶¶47-48 (distinguishing encapsulation from protocol conversion, and analogizing encapsulation to building a tunnel or channel for ST-II packets through the Internet). Encapsulation involved adding an IP header to a ST or ST-II packet, similar to putting a letter (ST or ST-II) inside of another letter (IP) and mailing it. Appx3777 ¶¶47-48; Appx3814¶¶59-60. Therefore, encapsulation was quite different from the conversion of the transmission into IPv4, as taught in the Patent.

24

RFC1190 made clear that an ST or ST-II transmission remained as such even after encapsulation. Encapsulation of ST packets in IP "allow[ed] them to pass through routers that d[id]n't support the ST protocol," and "[t]he IP header [w]as simply removed, then the ST header [wa]s processed as usual." Appx1689-1690. In other words, encapsulation treated the whole ST/ST-II packet (the packet's data and ST-II header) as "data" to which an IP header was added.

The resulting "encapsulation" IP packet therefore contained different information from the claimed conversion IPv4 packet's pure voice/signaling data received from the first network: The encapsulation "data" section included the ST-II header, and its IP header related to the ST-II packet, not the original voice/signaling. Appx1689-90 (IP header fields indicated that a ST packet is enclosed, set next-hop ST agent as the destination address, and set an appropriate value for the requested service type); *see also* Appx3814¶¶59-60; Appx3777¶¶47-48. By contrast, the claimed *conversion* has a markedly different purpose and function: It *creates an IPv4 packet* with an IPv4 character.

Given that Weinstein and RFC1190 combined failed to disclose converting voice transmission to IPv4, these prior art references did not render the Patent obvious. *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1351 (Fed. Cir. 2008) (requiring every claim limitation to be found in prior art references for obviousness analysis to proceed); *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1290

25

(Fed. Cir. 2011) (refusing to disturb nonobviousness finding where prior art failed to teach all of the elements of the patent).  Accordingly, the PTAB erred in finding the Patent invalid for obviousness based on the Weinstein-RFC1190 combination.

### B.    Intervenor failed to explain why the PTAB's obviousness conclusion relied on an argument not articulated by Cisco

AIP understood the PTAB as finding obviousness in part based on a new theory that a POSITA could take Weinstein's ST disclosures and substitute any data network, including IPv4, between two conventional telephony networks. AOB47-50.  The Intervenor has since clarified that the PTAB did *not* find that Weinstein's teachings could be substituted on *any data network*.  PTAB Intervenor Br. 12-13.  Nonetheless, the Decision remained predicated on the theory that a POSITA could "upgrade" the experimental Weinstein system/ARPANET from ST to ST-II, Appx29, notwithstanding the incompatibilities between ST-modified ARPANET and ST-II.  The Decision implied that ARPANET somehow teaches a layer of abstraction freeing a POSITA from the concerns of underlying physical networks.  Not only is this contradicted by the record, *see infra* Argument § II.C, but also, this argument was not among the contentions in Cisco's Corrected Petition, and is therefore improper.

26

### C.    Contrary to Cisco's contention, the PTAB did not properly weigh all of the factors relevant to the obviousness determination[2]

#### 1.    Cisco glosses over the incompatibility of ST-II and ST

Cisco glosses over the considerable differences between the ST and ST-II protocols and specifications, and the fact that ST-II was incompatible with ST. CRB52-53.  Yet the RFC1190 authors made clear in that protocol's specification that they did *not* intend to implement ST-II in the decommissioned ARPANET, as the ST-II network assumed a different network environment than the ARPANET in which ST was tested (and which was decommissioned 10 months after RFC1190 was published).  Appx1626; Appx1632-33; Appx3440; Appx3778-3779¶¶51-53.

---

[2]  Cisco asserts that AIP conceded at the IPR hearing "the prior art's disclosure of all the claim elements under [the PTAB's] constructions." CRB15, 38-39.  This is untrue.  The relevant excerpt reads:

> MR. ENG:  Under the broad preliminary construction of an internet protocol, we have no other arguments other than the objective consideration that why the combination is—it renders claims invalid. . . .

> JUDGE BUSCH:  So if we—if we went forward with our preliminary constructions, are you then saying that under our preliminary constructions, ST-II is an internet protocol as we've construed it?

> MR. ENG:  Yes . . . that is correct.

Appx530:9-17.  Rather than conceding, counsel explained that even under the PTAB's broad preliminary construction, objective considerations weighed against obviousness.  *See* Appx530:9-12.

27

As Dr. Pink explained, an ST-II sender could not connect to an ST receiver and ST-II packets running over ST would be requesting resources in a format the router did not expect.  Appx3779 ¶54.  The same difficulties arose in attempting to run ST packets over ST-II.  *Id.*  These facts, coupled with the unknown parameters affecting the interface and operation of layering a new protocol over the antiquated ARPANET system, would not reasonably motivate a POSITA to try to implement ST-II over the decommissioned ARPANET network.  *Id.*  (Indeed, all efforts to replace ST with ST-II for voice communications proved unsuccessful.)

Cisco argues that Weinstein's references to PRNET, WB SATNET, and LEXNET, in addition to ARPANET, indicate that Weinstein did not depend solely on the ARPANET as the network used for transmission.  CRB53-55.  But this is irrelevant because Weinstein disclosed configuring each of these networks to run on the ST protocol alone—not IPv4, the specific internet protocol claimed in the Patent.

It is also irrelevant that the various networks cited in Weinstein were joined together using the TCP/IP, CRB54-55.  In order to render the Patent obvious, Weinstein and RFC1190 would have had to disclose that IPv4 was used for ***converting the original transmissions***.  And they did not do this.

28

2.    **Internet engineers near the time of the Invention (1995) were not implementing ST-II for voice communication over the Internet**

AIP stated that the Patent "claims the benefit of Israeli patent application IL115580 filed October 11, 1995," Appx323, and submitted a declaration from Dr. Weinstein affirming this date.    Appx323, Appx3804¶¶22-24. Cisco had ample opportunity to contest the date, which AIP repeatedly referenced before the PTAB.[3]    Now, having abandoned its opportunity to challenge the priority date, Cisco baselessly contends that AIP did not establish the date.  CRB57-58.

Relatedly, Cisco contends—but does not substantiate—that "internet engineers near the time of invention of the Patent were implementing and considering implementing ST-II in various systems for voice communication across the Internet."  Appx28.  Cisco provides no record evidence supporting its contention.

---

[3] After initially challenging the 1995 priority date in its Corrected IPR Petition, Appx144, Cisco abandoned its challenge.  It had an opportunity to depose Dr. Weinstein, but did not ask any questions about the priority date.  Appx2418 (word index of Dr. Weinstein's October 27, 2014 deposition excludes "priority"); Appx2540 (reference in Dr. Weinstein's October 7, 2015 deposition to priority dates but no question about the dates).  Cisco filed a subsequent reply with the PTAB that was silent as to AIP's priority date.  Appx385-416.  At the PTAB hearing, AIP's counsel alone discussed the priority date.  *Compare* Appx3880 (AIP hearing demonstrative on "Priority Date of the '247 Patent"), *with* Appx3083-3117 (Cisco hearing demonstratives silent on priority date)*, and* Appx2941-3016 (no priority date discussion at hearing).

Both Crowcroft and Schooler's Internet Monthly Report, on which Cisco relies, only contemplated hypothetical, future applications of ST-II for voice communication. As Cisco acknowledges, the 1991 Crowcroft article described using *ST* to implement a videoconferencing system. CRB56 (citing Appx2106). As for the Internet Monthly Report, it tested video, not audio communication, and did so over DARTnet, not the Internet. AOB46 (citing Appx2444). Cisco contends that the Crowcroft authors were ***considering*** and the Internet Monthly Report described "***plans to test***" ST-II in various systems for voice communication across the Internet, CRB56-57. But these statements merely make AIP's point: neither source demonstrated any successful attempts at implementing voice transmission over the Internet using IPv4.

As for Delgrossi's *Design of Reservation Protocols for Multimedia Communication*, it was published in 1996, ***after*** the priority date of the Patent.[4] Cisco points to a Delgrossi excerpt describing a 1993 survey finding 13 separate ST-II implementations. CRB57 (citing Appx2486). But Delgrossi provided scant details, generally describing the implementations as having been run on "widespread platforms, operating systems, and subnetworks." Appx2486. Delgrossi did not state that any of the implementations involved conversion of

---

[4] In discussing the 1996 Delgrossi book, AIP's principal brief mistakenly cited to Appx3515-1517. AIP should have cited to Appx2467-2469, the part of the Delgrossi exhibit (Ex. 1032) that the PTAB referenced, Appx28. However, both documents are excerpts from 1996 editions of the Delgrossi book.

voice data. Indeed, ***none*** of the four implementations that Delgrossi identified appear to run over the Internet using IPv4: three are described as implementing ST-II over the "Ethernet" and the fourth over a "Defense Simulation Internet." *Id.*

The remaining sources now cited by Cisco (which the PTAB did not rely on, Appx1-35) likewise fail to show successful implementations to transmit voice communications over the Internet using IPv4. The IBM Ultimedia Server/6000 was referenced in a 1994 article by Delgrossi and others, Appx3030, but in 1996 Delgrossi indicated that there remained numerous hurdles that needed to be overcome before ST-II implementations could succeed, Appx3537. The newsletter discussing InVision and Wellfleet did not discuss a successful use of ST-II for videoconferencing, merely ***contemplating*** such uses. Appx3056-3057. The Department of Defense was described as having run a "***simulation*** across the Internet and worldwide videoconferencing." Appx3060 (emphasis added). These sources undermine Cisco's contention that the Patent— which solved the problem that so many others could not solve, by using a different method—was "obvious."

Finally, Cisco now claims, for the first time, that the Patent did not require good quality audio transmission. CRB58-59. But the Patent flatly contradicts Cisco's assertion. The central purpose of the Patent was "establishing and transmitting voice communication for a phone call." Appx54, 15:44-45. The Patent describes the field of the invention to include "***maintaining quality of***

31

*communication*" throughout the transmission.  Appx47, 1:21 (emphasis added). The Patent's emphasis on voice and transmission *quality* is evident.

Dr. Pink's ST-II tests in 1991-1992 showed that IP-encapsulated ST-II could not support *intelligible* voice calls over the Internet.  Appx3784-3787¶¶72-80. Cisco speculates that the poor quality of audio in these tests might be attributable to a low bandwidth internet link between Sweden and the United Kingdom. CRB58.  But the point overlooked by Cisco is that these tests *failed*.  And Dr. Pink and his collaborators concluded from their unsuccessful attempts that ST-II "'need[ed] revisions'" and was "'not ready for widespread distribution'" or "deployment."  Appx3786¶¶76-77 (quoting Appx3613).  Dr. Pink concluded that this was due to "the enormous complexity of the protocol and sometimes the vagueness of the RFC 1190 specification."

Tellingly, after this, internet engineers did not continue to pursue ST-II experiments.  Dr. Pink himself was unaware of *any* further ST-II research in the 22 years since 1995.  Appx3787¶¶77, 80.  As a result of problems uncovered by different ST-II tests, IETF never put ST-II on the Standards Track.  *Id*.  All of this shows that— contrary to Cisco's suggestion—ST-II was not a suitable network for conveying *intelligible* voice communications over the Internet.

Dr. Pink's testing demonstrated two inconvenient truths that Cisco stubbornly resists:  that ST-II could not be expected to transmit intelligible voice

calls over the Internet, and that before the Patent, internet engineers were unable to develop the claimed invention.  The PTAB also failed to give proper weight to this evidence.  *Cf. In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1080-81 (Fed. Cir. 2012) (commenting that the "failure of others" to develop the claimed invention can "be determinative on the issue of obviousness").

Given the failure of prior art combinations to teach the key conversion of the transmission to IPv4 and the multiple failures of others, the PTAB's obviousness finding was legally erroneous.

## CONCLUSION

For the foregoing reasons and the reasons presented in AIP's opening brief, the Court should reverse the PTAB's constructions of the terms "internet protocol" and "Internet protocol," and reverse the PTAB's finding that claims 1-9, 11-24, and 26-29 of the '247 Patent are obvious in light of the prior art.  Alternatively, the Court should vacate the Decision and remand the case to the PTAB to apply the proper claim constructions and to reconsider its obviousness determination.

DATED: March 30, 2017   <u>/s/ Karen H. Bromberg</u>
              COHEN & GRESSER LLP
              Karen H. Bromberg
              Francisco A. Villegas
              Damir Cefo
              Elizabeth F. Bernhardt
              800 Third Avenue
              New York, New York 10022
              P. 212-957-7600

              Erica C. Lai
              2001 Pennsylvania Avenue NW, Suite 300
              Washington, DC 20006
              P. 202-851-2070

              ENG LAW FIRM
              Chi Eng
              One Gateway Center, Suite 2600
              Newark, New Jersey 07102
              P. 646-770-2347

              *Counsel for Appellant*
              *AIP Acquisition LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS</u>

1.       This brief complies with the type-volume limitation of Federal Circuit Rule 32(a).

The brief contains 6,972 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.       This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in proportionally spaced typeface using Microsoft Word—Office 365 in Times New Roman 14 Point Font.

Dated:  March 30, 2017

/s/ Karen H. Bromberg
Karen H. Bromberg
*Counsel for Appellant*
*AIP Acquisition LLC*

FORM 30. Certificate of Service

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on   March 30, 2017
by:

☐ U.S. Mail

☐ Fax

☐ Hand

☒ Electronic Means (by E-mail or CM/ECF)

| Chi Eng | /s/Chi Eng |
|---|---|
| Name of Counsel | Signature of Counsel |

| | |
|---|---|
| Law Firm | Eng Law Firm |
| Address | One Gateway Center. Suite 2600 |
| City, State, Zip | Newark. NJ 07102 |
| Telephone Number | 646-770-2347 |
| Fax Number | 646-568-7231 |
| E-Mail Address | chi@englawfirm.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields